KLIEBERT, Chief Judge.
L. Paul DuTreil, II (“DuTreil”) filed suit against Dinon Precast, Inc. (“Dinon Precast”) seeking an accounting for and the recovery of commissions allegedly due to DuTreil under an oral compensation agreement. Dinon Precast reconvened for alleged real estate rentals. A trial of the matter was held on October 21, 1991.
The true issue before the trial court was the content of the oral compensatory agreement between DuTreil and Dinon Precast from January 1987 until DuTreil was terminated by Dinon Precast on July 13, 1987. The two versions of the agreement presented by the party litigants were diametrically opposed. After considering the testimony and documentary evidence, the trial court accepted DuTreil’s version of the agreement and, on December 30, 1991, rendered judgment in favor of DuTreil and against Dinon Precast in the sum of $43,711.23 plus legal interest and costs, and rejected the reconventional demand.
For the reasons hereinafter stated, we find the trial court was not manifestly erroneous or clearly wrong in its ruling and accordingly affirm the trial court judgment.
The business association commenced in 1984 when DuTreil began selling pavers and stepping stones for Dinon Precast. At that time DuTreil agreed to a compensation formula of 10% on gross sales, excluding freight.
When DuTreil began his employment sales were at a level of $140,000.00. Gross sales grew to $450,000.00-$500,000.00 in 1985, and to $700,000.00 in 1986.
In early 1987, Dinon Precast and DuTreil met to discuss the idea of employing additional sales personnel.
Mr. DuTreil’s version of the discussion was as follows: The plan discussed was to divide what was then considered to be the market place into three territories under the supervision of Mr. DuTreil who would have primary responsibility for the New Orleans territory. A Mr. Mac McMahon, who was already with the organization, would be offered one of the remaining territories and a Mr. A1 Knowles the other.
Under the new arrangement, Mr. DuTreil would be paid 10% of the gross sales including freight, as opposed to the old arrangement of 10% excluding freight, this for the reason that he, Mr. DuTreil, would be responsible for the additional costs in connection with the new salesmen. It was anticipated that they would be paid at first *145 on a flat monthly amount plus mileage, and after six months or so on a commission basis, with Mr. DuTreil being responsible for the costs in connection with their hiring.
Subsequently, Mr. DuTreil, Mr. Dinon and a Mr. George Mydland, who was at that time manager for Dinon Precast, met with Mr. McMahon, who rejected the plan, choosing to work directly for Dinon Precast as an independent contractor selling installations of Dinon Precast products. Mr. A1 Knowles was approached and he accepted the offer made to him of $200.00 per week plus twenty cents a mile, with it being anticipated that he would go on a commission basis in six months. He commenced work in April of 1987 and was paid at the aforementioned rate by Mr. DuTreil until the latter’s termination in July.
A second salesman, Mr. Bill Wither-spoon, was hired under terms identical to the arrangement with Mr. Knowles and he performed services and was paid accordingly until he left after about six weeks.
Mr. DuTreil testified that all during the period from January until the middle of July 1987, he continued calling on customers in all three territories with the workload getting, according to his description, “heavier and heavier.” During this period he was not paid on the basis of the 10% of gross sales plus freight, but rather received several $2,500.00 checks, totalling $15,000.00, the first being issued on March 31, 1987 and the remainder at irregular intervals thereafter. He testified that though he had not agreed to payment in this manner, did not understand why it was being done in this way, but did not seek an immediate explanation as this was a slow period as he knew from experience.
After he was terminated the plaintiff testified that he approached Mr. Dinon and requested of him an accounting, “a squaring away of all the commissions that he owed to me” and was told to come back in two weeks and he would be paid what he was due. When asked what happened when he went back two weeks later, the witness replied:
“A. Not much, when I first got back at his office, he wasn’t in and I had asked Doris if he had left a check for me for commissions that were due and she said, no. As I was walking out of the office he drove up and the only word I recall every (sic) getting [out] of my mouth well, because he obviously knew I was there, and he said to me at that point that over the past weekend he had gone over his records and that he figured he had paid me just enough money to cover the amounts of monies that I had paid to the salesmen that were working for me so that I would not have paid any of those monies out of my own pocket, but if I wanted any other commissions due me that I have to sue him for them and with that he walked away and slammed the front door of the building in my face.”
Mr. Dinon’s version of what transpired between the parties is different from that of DuTreil. He admitted that in 1986 his business experienced significant growth, which he attributed in part to the fact that “Mr. DuTreil worked extremely well and very hard at getting accounts for me” together with the circumstance that his only competitor, American Clay and Concrete, went out of business. The additional business and attendant increased burden on his sales people prompted the January 1987 meeting at which he produced the document which was to provide the formula for the pay to be received by Mr. DuTreil and Mr. Knowles. It is labeled “Sales Information Sheet” and introduced into evidence as Plaintiff Exhibit No. 5 and Defendant Exhibit No. 4. He admitted that the document was not his creation but was a program for sales people for the “U N I Group,” of which he was a member.
Under the Plaintiff-5, Defendant-4 formula, both DuTreil and Knowles would receive base salaries plus a bonus based on a sliding scale depending upon the level of gross sales in their territory. The witness indicated that Mr. DuTreil was to be paid a bonus on sales in all three territories for overseeing the entirety of the sales operations that he began working under the agreement on January 15, 1987 and Mr. *146 Knowles began working under the agreement in April 1987, with bonuses to be paid at the end of the year.
While Mr. Dinon testified that he filled out Plaintiff-5, Defendant-4 prior to the meeting and presented it to the parties, this is denied by the plaintiff who denies not only having not agreed to its provisions, but stated emphatically that he never even saw it until after suit was filed.
Mr. Dinon’s bookkeeper, Doris Alford, testified that her understanding was that under the agreement Mr. DuTreil was to be paid. $2500.00 per month on the last day thereof, with the payment to be treated as an “advance.” Commissions were not to be paid until the end of the year, but she was not sure whether the $2500.00 per month was to be deducted from the total commission. She was at a complete loss to explain the erratic payment of the $2500.00 sums to the plaintiff as follows:
[[Image here]]
March 31
April 16 16 days
April 24 8 days
May 5 11 days
May 29 24 days
June 12 14 days
The employment records with respect to Mr. A1 Knowles bear out the plaintiff’s version of the arrangement and are inconsistent with that of the defendant. They show that from March 6,1987 through May 26, 1987, Dinon Precast paid Mr. Knowles some limited commissions based upon 10% of gross sales. No payments were made by it of $200,000 nor were any mileage payments made until after the plaintiff’s termination. Mr. DuTreil testified that it was he who paid Mr. Knowles per week and mileage.
The plaintiff’s version of the agreement is also verified by the testimony of Mr. George Mydland, Manager of Dinon Precast from late 1983 until July 1987. He was present during the January 1987 discussion with respect to new territories and additional salesmen during which, he stated, Mr. Dinon agreed to pay Mr. DuTreil the commission on the freight charges which would offset the cost of paying additional salespersons. He confirmed that this was complied with by the plaintiff by his hiring additional people.
Further, verification of the plaintiff’s concept of the agreement was introduced by way of the testimony of Mr. McMahon. This gentleman testified that he was among those present at the January 1987 meeting and offered a position of sales representative with a choice of territories. He declined the offer in a classic fashion but was emphatic in confirming that plaintiff was to be paid at 10% of the sales in his territory and that he would be paid from a. portion of that.
Counsel for Dinon Precast urges that while plaintiff may not have expressly agreed to the proposal advanced by his client, that he did so by his silence, inaction, and action in accepting compensation under the new arrangement without question or complaint. We do not agree. We accept the account of the plaintiff as did the trial judge who, in his reasons, held as follows:
“Plaintiff, Dutreil, began his association with its defendant (Dinon) in 1984. The evidence is uncontradicted that Du-treil was to receive 10% of gross sales excluding freight and Dinon’s business experienced substantial growth $140,-000.00 gross sales in 1984 to approximately $700,000.00 gross sales in 1987) during the period Dutreil was selling the products.
After weighing the testimony of the witnesses and considering the exhibits, the Court finds as a matter of fact that the commission was modified to reflect 10% commission of gross sales including freight when Dutreil agreed to hire additional salesman. The salesman were to be paid by Dutreil.
The evidence further establishes that Dutreil was terminated July 13, 1987. That Dinon had gross sales subject to Dutreil’s commission in the amount of $587,112.00.
Therefore, Dutreil is entitled to a commission of $58,711.23 less sums paid of $15,000.00 with interest from date of demand and for all costs.”
*147 The standard we are to follow in reviewing the ruling of the trial court was set out by our Supreme Court in Rosell v. Esco, 549 So.2d 840 (La.1989) at pages 844-845 as follows:
“It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of ‘manifest error’ or unless it is ‘clearly wrong,’ and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous — clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.”
Thus, not only is this a factual controversy in which the “clearly wrong” standard must be applied, it is one where the record amply shows the trial judge’s conclusions were correct.
The appellant has apparently abandoned its reconventional demand for no errors are assigned or argued relative to same.
For the reasons assigned, therefore, the judgment appealed from is affirmed. Costs of the appeal are imposed on appellant.
AFFIRMED.